# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

  **v.**                            **Case No.**     **26-CR-104**

**FERNANDO RAMIREZ,**

   **Defendant.**

---

## ORDER FOR RELEASE (STAYED)

---

After the defendant was arrested in the Central District of California, a magistrate judge ordered the defendant's release. The government appealed that order to this district (the charging district), and the assigned district judge vacated the release order and directed the assigned magistrate judge in this district to conduct a *de novo* hearing. ECF No. 13. In particular, the court directed that the parties develop a full record, including the level of dangerousness that the defendant's release would pose to the community. That hearing occurred on June 26. For the reasons that follow, I will order the defendant's release pending trial. However, because the matter is under the review of the district judge, I will stay this order to allow the government to file an appeal to that judge, if it so desires.

The Bail Reform Act requires a judge to consider several factors when deciding whether to detain a defendant or to release him with conditions. These include: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger, if any,

that release would pose. 18 U.S.C. § 3142(g). The district judge assigned to this matter directed that this court focus on developing facts directed to the fourth factor, that is, the nature of any danger the defendant would pose to society if released. ECF No. 13. Although I will focus on that factor, I will set forth my findings with respect to the first three factors in order to create the "full record" directed by the district judge. *Id.* at 2.

## I. Nature and Seriousness of the Offense

The defendant, aged 22, is charged with conspiracy to possess with intent to distribute fentanyl in large quantities. The facts are simple but striking. According to the government, on April 1, 2026, the defendant boarded a plane in Los Angeles with twelve kilograms of fentanyl in his carry-on luggage. His final destination was Milwaukee. When he arrived, he booked a hotel room and then visited a car in the hotel parking lot that was operated by a confidential informant working for the police. The two men did not know each other: the defendant required the CI to provide a dollar bill serial number that had been pre-established as a kind of code word. Once the defendant was satisfied that the CI was the proper co-party to the transaction, he removed packages from his luggage and placed them in the rear of the CI's car. Then he left. (The defendant did not receive any money.) The defendant left town the next day. Lab testing later revealed that the substance in the packages was fentanyl, with a mass of twelve kilograms. The government soon filed a criminal complaint and indictment against the defendant.

That parking-lot transaction was just the final act of an elaborate scheme that had been in the works for some time. The defendant was able to board a plane with 12 kilos of fentanyl thanks to the assistance of two or more employees of American Airlines. These airline employees were not subject to normal airport security screenings, a fact they exploited to bring

large quantities of drugs into secure areas of the airport without detection. They brought the drugs to a prearranged bathroom that the defendant, toting empty luggage and having already passed through TSA screening, visited at a prearranged time. The defendant filled his luggage with the drugs and then boarded the plane with his now-full carry-on. The airline employees then left without drawing attention to themselves.

The government notes that the April 1 flight described above was not the defendant's first such flight. On March 17, 2026, just two weeks earlier, surveillance shows the defendant visiting the Los Angeles airport (LAX) and visiting the same bathroom he used on the morning of April 1. The defendant entered the bathroom with the same suitcase. The same American Airlines employees were also in that bathroom at the same time. (These employees were present at the airport despite not being scheduled to work.) The defendant then traveled to his destination (not Milwaukee) carrying that same suitcase, which was now presumably loaded with illegal drugs. Thus, the defendant is convincingly implicated in two such trips. That's not all: although the government does not have concrete evidence that the defendant was transporting drugs on flights other than the two just described, it notes that the defendant flew from the Los Angeles airport at least thirteen times during the previous year, always for just a day or two, and always leaving LAX around 6:00 a.m. At the hearing, the defendant did not supply an innocent explanation for these other trips. And, given that he is a young unemployed man without apparent connections to the cities he visited, it is a reasonable inference that those trips were in a similar vein. It thus appears beyond reasonable question that the defendant had been working as a courier for a drug-trafficking organization for at least a year. And if the April 1 trip was representative, the amount of drugs he transported is

3

well over 100 kilograms. The government stated that his delivery fee was $19,500 per trip, although a search of his residence did not uncover large amounts of cash.

Somewhat unusually, the defendant is charged in a single-defendant indictment from this district, rather than as part of a larger drug conspiracy case. When asked for more detail about the DTO, the government explained that as soon as DEA uncovered the fact that couriers were carrying dangerous drugs on airplanes, it had to act fast to curtail that activity. Thus, unlike the usual federal case, the government could not take the time to build a broader conspiracy case with extensive surveillance and searches of digital data over the course of several months. The end result is that we know rather less about the extent or nature of the conspiracy in which the defendant was apparently involved, and very little about any co-defendants. However, one can make reasonable inferences that the DTO is sophisticated and lucrative. It can arrange flights all over the country with an unknown number of couriers like the defendant. It can pay them almost $20,000 for a just a few days of work. It uses passwords to ensure secrecy. It has the resources to recruit individuals who work for airlines, which must cost dearly. And we must expect that this defendant is merely the tip of the iceberg—how many others are transporting twelve kilos of drugs per month all over the country?

Even if we know little about the DTO itself, we know much more about the defendant's own role. At the hearing, the government explained that the defendant did not receive currency in exchange for the drugs he provided (at least in Milwaukee). Someone else handled the money. There was no evidence the defendant was involved in planning the trips; in fact, he seems to have been at the beck and call of others to be ready to conduct business on short notice. The defendant also did not know much about other people in the conspiracy, which is a common way for cartels to insulate their members from criminal liability. The

4

government did not argue that the defendant played any kind of leadership role. Given the defendant's young age and the activities we do know about, it seems likely the defendant was simply a twenty-two year-old drug courier.

It goes without saying that the offense is extremely serious even if the defendant were merely a courier for the organization rather than a moving force. The public health dangers of fentanyl are obvious, and the amounts of the drugs the defendant transported are immense. The government notes the amount of fentanyl in question, merely from the April 1 trip, could have killed millions of people. It also argues that airplane passenger lives were at risk: had the luggage been bumped and had some of the fentanyl gotten into the circulating air, the passengers could have ingested it. These latter points perhaps exaggerate the danger, but they are not completely off base. Even so, I also recognize that this defendant was not a leader of the organization, or even a mid-level manager. He simply waited around to be told where to go. *United States v. Portillo-Camargo,* No. 22-1244, 2022 WL 5434556, at *4 (10th Cir. Oct. 7, 2022) ("Clearly, the 'detriment to the community' concern expressed in § 3142(e) is greater with respect to an organizer as opposed to a mere courier.") Moreover, I further note that a large proportion of federal drug defendants are also charged with gun offenses, either as felons in possession or as § 924(c) defendants who use guns in connection with their drug dealing. This defendant faces no such charge. In sum, although the offense is obviously quite serious, the defendant's involvement as a "mere" courier and the absence of gun activity are somewhat mitigating factors.

## II. Weight of the Evidence

As is common in federal cases, the government demonstrated strong evidence of guilt. It has surveillance and a confidential informant credibly receiving twelve kilograms of

fentanyl in a hotel parking lot. It has the defendant's flight records, and the airport surveillance showing the defendant entering the same bathroom at the same time as the American Airlines employees. Other flight records are suggestive of a pattern. The weight of the evidence was strong and was therefore largely undisputed.

### III.    Defendant's Personal Characteristics

The defendant is a 22-year-old U.S. citizen. According to the bond study from the Central District of California, he has lived in the same home with his parents and siblings his entire life. He has no children but has a girlfriend of two years.

Although the defendant is a citizen, his connections with the country of Mexico received substantial attention. The defendant reported to the pretrial services officer that he'd previously traveled to Mexico as a child and teenager; the government notes that border records indicate he also traveled to and from Mexico twice in January 2025, just last year. The government, of course, does not know the purpose of those two trips, while the defendant says one trip was just a weekend jaunt while the other was a trip to get dental care for his girlfriend. Either way, the defendant did not disclose the trips when speaking with Pretrial Services.

The defendant has been unemployed for six or more months and did not finish high school. This raises a concern as to how the defendant would propose to make ends meet if he were released. However, given that he lives with close family, I do not place substantial weight on that concern.

The defendant's criminal history shows that he has not served any time in custody. The bond study indicates that in 2022 and 2023 he had law enforcement contacts regarding carrying a loaded firearm, possessing a controlled substance for sale, and taking a vehicle

without consent. Whatever the underlying facts, these charges did not result in convictions. The government also notes that his cell phone prominently shows an image of someone brandishing a firearm, which indicates an interest in such weapons.

Ultimately, the defendant's lack of criminal convictions strongly supports a release order, as a person's past is often prologue: someone with a history of criminal activity is obviously more likely to re-engage in such activity than someone for whom the charged conduct was an aberration. No doubt that is what generated the release recommendation from the pretrial services office. On the other hand, the defendant's ties to Mexico are concerning. Although millions of Americans have similar ties to Mexico, they are not facing a lengthy federal sentence with the inherent temptation to flee.

### IV.     Nature of Dangerousness to the Community Upon Release

The final factor to consider asks the court to predict what level of danger, if any, would be posed to the community if the defendant were released. At the hearing, I contended it was unlikely that the defendant would be able to reprise his role as an airplane drug courier now that the feds are onto him and now that the airline employees have been apprehended. The government did not dispute that contention. It also did not contest my assertion that the government surely has means, such as a no-fly list, of keeping the defendant off of airplanes. Finally, the imposition of GPS monitoring and home detention would alert the government almost immediately if the defendant even attempted such conduct. For these reasons, I conclude that, if released, it is highly unlikely that the defendant would be able to return to the kind of criminal conduct described in the indictment.

The question of dangerousness is not so narrow, of course. If the airports are closed to the defendant, it is not completely far-fetched to think the defendant will find a way to

7

transport drugs by truck or mails. As with most crimes, the means is not as important as the end. Even so, the defendant's lack of serious criminal history suggests the defendant is not *generally* a criminal and that he lacks any kind of predilection for conducting himself in that fashion. Moreover, the defendant has no history of flouting conditions of release that would suggest the defendant cannot be trusted to remain law abiding. And because he lives with his parents, there will be less need to engage in drug-dealing activities merely to pay the bills. Finally, now that the defendant will find himself under the watchful scrutiny of law enforcement and pretrial services (including home detention with GPS monitoring), it is even less likely that he would be able to transport drugs.

In sum, the defendant appears to have been a young opportunist who proved unable to resist the easy money to be made from working as a courier for a large drug cartel. If he is found guilty, he will serve time for that decision. However, looking forward, I do not believe it likely that his pre-trial release would pose a substantial danger to the community.

### V. Detention is Not Warranted Based on Dangerousness to the Community

The weighing of § 3142(g) factors tilts in favor of release. First, the nature of the offense is quite serious given the quantity and dangerousness of the drugs in question. However, the defendant's involvement as a mere courier and the lack of any gun activity mitigate that seriousness somewhat. Second, the weight of the evidence is strong. Third, the defendant's personal characteristics, in particular his light criminal record, and his life at home with his family, suggest that the defendant could remain law-abiding if released. Finally, the defendant is unlikely to resume drug activity in the fashion he was charged with in this case. And, more generally, the defendant would be unlikely to deal drugs in *any* fashion given the absence of criminal history and the order of home detention. I conclude that these factors outweigh the

8

seriousness of the offense and the weight of the evidence. Thus, although there is a presumption of detention, I am also mindful that the government bears a higher burden to show by "clear and convincing evidence" that the defendant poses a danger to the community. 18 U.S.C. § 3142(f)(2)(B). I conclude that the government has not met its burden to demonstrate dangerousness.

## VI. Detention Is Not Required to Ensure the Defendant's Appearance

The question of the defendant's risk of flight is a closer call. First, the defendant is a young man facing a lengthy sentence. The government notes that the mandatory minimum is ten years but, given the large quantities of drugs, his actual sentence could be much higher. That alone is enough to create a risk of flight in anyone. Second, although he has a girlfriend, he has no spouse or children keeping him here. He does not own a home. He also has family in Mexico (although it was not specified how close that family actually is.) Finally, the nature of the crime involves secrecy, including the use of a dollar-bill serial number code, and conspiring with others to evade detection. This indicates some ability to coordinate with others to achieve clandestine ends.

More concerning to me is that the defendant is credibly alleged to be a member of a large-scale, sophisticated, and obviously lucrative drug-trafficking organization. His own involvement suggests trafficking more than one hundred kilos of drugs in the last year, and the defendant is just one of an unknown number of participants in the organization, which the government alleged was connected to a cartel. I noted at the hearing that such organizations do not generally want their members, even low-level couriers, to stand trial, talk to the government, or testify. It would be very convenient, and relatively inexpensive, if the defendant were furnished means to leave town. *United States v. Palmer-Contreras,* 835 F.2d

9

15, 18 (1st Cir. 1987) ("The large amount of drugs supports the court's inference (for detention purposes) that defendants are connected to persons or an organization with great financial resources, an organization which could finance defendants' relocation.")

On balance, however, the government could not convincingly make this argument because (for reasons detailed above) it knows so little about the DTO. In short, we simply do not know if this organization has a practice of funding defendants' escapes. Moreover, the limited nature of the defendant's involvement means he likely does not know terribly much about the conspiracy in the first place, which suggests the DTO might very well be comfortable with allowing him to be prosecuted in the normal fashion. Finally, I note that his brother and girlfriend were willing to post significant amounts of money as bond, which suggests those closest to him are expecting him to remain and face his charges. In sum, the possibility of a cartel-funded flight was my largest concern, *Palmer-Contreras,* 835 F.2d at 18, but without any evidence to that effect I must conclude that the government has not met its burden to demonstrate the there are no conditions of release that would reasonably assure the defendant's presence at future court dates.

## VII.   Conclusion

In sum, I conclude that the government has not met its burden of establishing either that the defendant poses a danger to the community or that he has a significant risk of non-appearance. I further conclude that the conditions imposed by the court in the Central District of California, in particular the requirement of home detention with GPS monitoring, will adequately protect the community and reasonably assure the defendant's appearance. ECF No. 14. I therefore order the defendant **released** with those conditions. This order will be

**stayed** until 5:00 p.m. on Tuesday, June 30, to allow the government to file an appeal to the district judge.

       **SO ORDERED** this 29th of June, 2026.

                             STEPHEN C. DRIES
                             United States Magistrate Judge